IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>AIRWAY INDUSTRIES, INC.,<br><br>　　　　　　　　Debtor.<br><br>OFFICIAL COMMITTEE OF<br>UNSECURED CREDITORS<br><br>　　　　　　　　Movant,<br><br>　　　　v.<br><br>AIRWAY INDUSTRIES, INC.,<br>CERBERUS CAPITAL MANAGEMENT,<br>L.P., MADELEINE, L.L.C.<br><br>　　　　　　　　Respondents. | Case No.: 06-20224 JKF<br><br>Chapter 11<br><br>Related to Document No. 147 |

## MEMORANDUM OPINION[1]

Before the court is a motion by the Official Committee of Unsecured Creditors ("Turnover Motion")[2] seeking entry of an order pursuant to §§503, 541, 542, and 105 of the Bankruptcy Code directing that Transaction Bonuses[3] provided by a secured creditor be turned over to Debtor's estate or, in the alternative, disallowing or prohibiting payment of the bonuses

---

[1] The court's jurisdiction was not at issue. This Memorandum Opinion constitutes our findings of fact and conclusions of law.

[2] DN 147.

[3] The bonuses were labeled as "Insider Bonuses" in the Committee's Motion and titled as a "Transaction Bonus" in the written Bonus Agreements. DN 214, Exhibit A.

1

pursuant to §503. The beneficiaries of the bonuses are four executives of the Debtor. The bonuses are to be provided by Cerberus Capital Management, L.P. ("Cerberus Capital"), an affiliate[4] of Cerberus Partners, L.P. ("Cerberus Partners"), and Madeleine, L.L.C. ("Madeleine", and collectively with Cerberus Partners and Cerberus Capital, "Cerberus").[5] The bonuses were conditioned on the executives remaining with the company until the proposed sale was completed and the bonuses were to be paid by Cerberus, following the sale.[6] The purported intention of the bonuses, as asserted by Cerberus, was to stabilize the company and maximize the value of the sale. Both Cerberus and the Debtor filed responses, requesting that the court deny the Turnover Motion.[7]

BACKGROUND

It is undisputed that the Debtor is a Pennsylvania corporation founded in 1919 as Reliable Trunk Company. Debtor did business as "Atlantic Luggage Company" and sold specialty luggage products and travel accessories to department stores, specialty luggage stores, and other distribution channels in the United States, Canada, and China. As of the Petition Date, Debtor

---

[4]Under §101(2) of the U.S. Bankruptcy Code, "affiliate" means "(A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote." 11 U.S.C. §101(31).

[5]According to Debtor's List of Equity Security Holders, Madeleine and affiliates own 42.43 percent of Debtor's equity.

[6]The bonuses were to be paid following sale regardless of whether or not Airway entered bankruptcy proceedings. See Bonus Agreements, DN 90, Exhibits A, B; DN 214, Exh. A.

[7]Airway Industries Inc.'s Response, DN 215; Cerberus's Response, DN 214.

had approximately 90 employees. Approximately 67 of these employees were located at Debtor's corporate headquarters in Ellwood City, Pennsylvania, and the remaining employees worked in Debtor's facilities in Orland, California, Mississauga, Canada, and Hangzhou, China.

The Cerberus Entities hold secured claims and interests in a partnership that holds shares of Debtor's preferred stock. Cerberus Capital, signatory to the Bonus Agreements, is an affiliate of Cerberus Partners. Madeleine, an affiliate of Cerberus Partners, is also a prepetition secured creditor of the Debtor and was the lender to Debtor under a debtor-in-possession financing facility.

On January 20, 2006, Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Pennsylvania. The United States Trustee for the Western District of Pennsylvania (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors of Airway Industries, Inc. (the "Committee") on February 6, 2006. No trustee or examiner has been appointed in this case. Pursuant to §1107 and §1108 of the Bankruptcy Code, Debtor continues to operate its business and manage its respective properties as debtor-in-possession. 11 U.S.C. §1107; 11 U.S.C. §1108.

Prior to the Chapter 11 filing, Debtor's business was in substantial decline. According to the testimony of Grace Kurowska, Debtor's Executive Vice President and Chief Financial Officer:

> We realized that our sales [were] dropping significantly. It got to the point that in September of 2004 we ran out of cash to run the operation . . . . We, at that time, lost the business with J.C. Penney. We lost the business with Kohl's. Eventually, in early 2005 we lost business with Marshall Fields.

3

2/27/06 Sale Hearing Transcript at 33:20-22; 37:22-24, DN 180. Many of the sales people left the company for more lucrative opportunities elsewhere, which accelerated Debtor's financial decline. *Id.* at 39:9-13. The former Chief Executive Officer, John Dudash, was one of those who left Debtor's employ during that time. Without access to capital, management decided that a sale was Debtor's only viable option. As the company was considering its options, its senior management employees were being offered more lucrative opportunities elsewhere. In an effort to stabilize the business and preserve the value of Debtor's assets in any subsequent sale, and well before the bankruptcy was filed or the BAPCPA amendments took effect, Cerberus Capital, on behalf of Cerberus, proposed to pay Transaction Bonuses and entered into written incentive Bonus Agreements with William Berry (Chief Executive Officer) ("Berry") and Grace Kurowska (Executive Vice President and Chief Financial Officer) ("Kurowska") and oral agreements with Brian Miller (Vice President, Sales and Marketing) ("Miller") and Gerald Carr (Comptroller) ("Carr" and, collectively with Berry, Kurowska and Miller, the "Management Employees"). *See* 2/27/06 Sale Hearing Transcript, DN 180, Kurowska' testimony beginning at 31. The written Agreements were signed in August, 2005. DN 90, Exhibits A, B; DN 214, Exhibit A.

The Bonus Agreements provide that if Debtor sells all or substantially all of its assets – regardless of whether such sale occurs outside or in the context of a bankruptcy case – and Cerberus receives cash distributions from the sale proceeds, each Management Employee will receive his or her applicable Transaction Bonus. *See* DN 90, Exhibits A, B; DN 214, Exhibit A. The amounts of the bonuses were as follows: $500,000 for Berry; $75,000 for Carr; and the greater of (i) $300,000 and [*sic*] (ii) 4 percent of the amount by which the net proceeds of

distributions to Cerberus from the sale exceed $14.6 million, up to a maximum of $320,000 for Kurowska and Miller. The Berry, Kurowska, and Miller Bonus Agreements also provide that if those individuals are not offered positions as of the closing of a sale comparable to those they held with Debtor at the time of execution of the Bonus Agreement, each would have the opportunity to become a consultant on the "operations team" of Cerberus Capital and its affiliated companies. The Bonus Agreements were signed on August 15, 2005. *See* DN 90, Exhibits A, B; DN 214, Exhibit A.

On January 27, 2006, Debtor filed a motion for an order approving an asset purchase agreement among itself, TravelPro International, Inc. ("TPI"), Austin House, Inc. and Cerberus Partners. DN 70. On February 8, 2006, Debtor filed a supplement (the "Supplement") to the Sale Motion, disclosing to the court and interested parties that four of Debtor's executive officers – Berry, Kurowska, Miller, and Carr – had either entered into or would enter into incentive bonus agreements with Cerberus Capital. DN 90.

On February 10, 2006, the U.S. Trustee filed an objection to the Sale Motion requesting that the court prohibit the payment of the bonuses. DN 92. On February 23, 2006, the Committee filed its Turnover Motion, demanding that the bonuses be turned over to Debtor's estate or, alternatively, that the court disallow or prohibit payment. DN 147.

The hearing on the Sale Motion was held on February 27, 2006.[8] This court entered an order on February 28, 2006, approving the sale to TPI and found that "Debtor's marketing efforts and solicitations conducted in connection with the sale process were appropriate and reasonable

---

[8]Sale Hearing Transcript, DN 180.

and designed to obtain the highest and/or best price for the Acquired Assets."[9] On March 2, 2006, the closing on the sale to TPI occurred.

ANALYSIS

Under the facts of this case, Debtor pursued the sale of the company and negotiated the Bonus Agreements prepetition and prior to the effective date of BAPCPA. The court recognizes that the timing of the sale, the bankruptcy filing, and the changes in the Bankruptcy Code created a unique situation likely never to occur again.

The Committee first requests that the Transaction Bonuses be turned over to Debtor's estate under Bankruptcy Code §541 and §542. Under §541, the filing of a petition creates an estate compromised of all property, "wherever located and by whomever held, of all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. §541(a)(1). *See also U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 205 (1983). If property is established to be property of the estate and is not in possession of the debtor, trustee, or debtor-in-possession, §542 governs the turnover of such property to the bankruptcy estate. *See* 11 U.S.C. §542. Additionally, the court has authority, under §105(a) to "issue any order . . . necessary or appropriate to carry out the provisions of" title 11.

A turnover under §542 is predicated on a determination under §541 that the property at issue is property of the estate. The Committee alleges that the Transaction Bonuses will be paid from property of the estate; however, that is not so. Rather, Cerberus has agreed to pay the bonuses from its own funds. *See* DN 90, Exhibits A, B; DN 214, Exhibit A. The Bonus

---

[9]Sale Order, DN 171 at 3.

Agreements explicitly provide that Cerberus, not the Debtor, will pay them "in the event that the [Debtor] sells all or substantially all of its assets . . . and, as a result, [Cerberus] receives cash distributions . . ." DN 214, Exhibit A.

The Committee cites no relevant law to show that a court may order turnover of non-estate property under §542. The Committee relies on *In re Dalow Industries, Inc*., 333 B.R. 640 (Bankr. E.D.N.Y. 2005), arguing that it is analogous to the current situation. However, *Dalow* is easily distinguishable. In *Dalow*, the debtor sold its assets to the highest bidder at an auction, with the provision that as part of the purchase price, the purchaser would pay the secured claim of the debtor's bank. *Id.* at 641. After the sale and payment, an accounting error was discovered, through which the bank had received overpayment of interest. The debtor successfully moved for turnover of the overpayment, pursuant to §542. The issue was not whether the funds properly paid to the bank remained property of the estate, but whether the overpayment – to which the bank had never been entitled or made a claim – remained an asset of the estate. The current situation would be analogous to the funds properly paid to the bank, not the overpayment. Here the proceeds of sale will be paid to Cerberus in satisfaction of its security interest. In fact, the proceeds of sale will not pay the secured claim in full. Cerberus then will use its own funds to pay the bonuses. Because Cerberus will pay the bonuses from its own funds, the request for turnover under §542 must be denied.

The Committee alternatively argues that if the court determines that the bonuses are not property of the estate, they should be disallowed or prohibited because §503(c) of the Bankruptcy Code "expressly prohibits such payments." DN 147 at 11. Section 503(c) covers three categories of administrative expense:

>(1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business . . .
>
>(2) a severance payment to an insider of the debtor . . .
>
>(3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

These three categories of administrative expense are prohibited unless a finding by the court based on evidence in the record indicates that the statutorily prescribed limitations are not exceeded. The Committee made an argument for the application of §503(c)(1) and the U.S. Trustee argued that both §503(c)(1) and §503(c)(2) apply.[10] However, the application of §503(c) is inappropriate considering the unique facts of this case.

Section 503 applies to "Administrative Expenses of the Estate." The court did not receive an administrative expense request from the parties who would receive the bonuses or from Cerberus. Rather, notice of the agreement was introduced in a Supplement to the Sale Motion.[11] An administrative expense request is filed in order to obtain court approval for the expenditure of estate assets. Here, the estate is not paying the bonuses; Cerberus voluntarily agreed to make the payment from its own funds in an effort to maximize its distribution. The

---

[10] The Committee has not argued that §503(c)(2) or (c)(3) should govern the bonuses. The U.S. Trustee acknowledged that §503(c)(3) is inapplicable but suggested that the payments could possibly be deemed severance payments, therefore implicating §503(c)(2). DN 92: DN 205.

[11] "The purpose of this Supplement is to provide the Court and all interested parties with information regarding incentive bonuses and potential future employment opportunities being provided to certain members of the Debtor's management team by Cerberus Capital Management, L.P." DN 90.

8

payments will not be allowed administrative expenses to be paid from the Debtor's estate, nor will Cerberus seek reimbursement from the estate for payment of the Transaction Bonuses. Section 503(c) of BAPCPA was adopted in an effort to deal with the effect that large administrative claims arising pursuant to KERPs have on the estate.[12] The court in *In re U.S. Airways, Inc.*, 329 B.R. 793 (E.D. Va. 2005), noted that the primary concern with KERPs is an unwarranted depletion of the debtor's estate at the expense of the creditors:

> All too often [KERPs] have been widely used to lavishly reward –
> at the expense of the creditor body – the very executives whose
> bad decisions or lack of foresight were responsible for the debtor's
> financial plight.

*Id.*, 329 B.R. at 797. These concerns do not arise under the facts of this case because the bonuses create no expense to the estate or diminution to the creditor body. The financial burden rests solely on Cerberus. Because Cerberus is undersecured, there is no way unsecured creditors will be paid from the sale. The objections of the Committee and the U.S. Trustee asserting application of §503(c) are inappropriate because the Transaction Bonuses are not administrative expenses and do not otherwise deplete the Debtor's estate at the expense of the creditors. The Transaction Bonuses will not be disallowed or prohibited under §503(c).

The Committee also alleges that Cerberus constructed the Bonus Agreements with the intention of circumventing §503(c). However, the evidence establishes otherwise. Under the Bonus Agreements, Cerberus's obligation is not predicated on the Debtor's bankruptcy filing but

---

[12]Section 503(c) was a last minute addition to BAPCPA proposed by Senator Edward M. Kennedy, D-Mass. The addition of the Section occurred without any debate and there is no written record regarding the deliberations. A reported statement by Senator Kennedy explained that the amendment was "designed to stop the travesty of high-level corporate insiders who walk away with millions while the company's worker's and retirees are left empty-handed." *See* Mike Casey, "Benefit Inequity Deepens Gap," The Kansas City Star, July 24, 2005.

only on the sale of assets. The only conditions to payment of the Transaction Bonuses are: (i) the sale of substantially all of the Debtor's assets (whether in or outside of a bankruptcy case); (ii) Cerberus receiving a cash distribution as a result thereof; and (iii) the applicable Management Employee being in good standing immediately prior to the closing of any sale. The credible evidence indicates that the Bonus Agreements were not written in anticipation or even contemplation of the new bankruptcy law.

> Q: The agreements that you reviewed you signed in August?
> A: Okay.
> Q: Did you discuss these agreements with [the Management Employees] before they were signed?
> A: Yes.
> Q: It was about the same time that you learned about the changes in the Bankruptcy Code?
> A: No, there was no connection between the two. I think our assumption was when we entered into these agreements, the company was going to file for bankruptcy before the Code changed. So I don't think there was any relevance.
> Q: Why were you considering filing for bankruptcy before the Code changed?
> A: I think the assumption was that the Asset Purchase Agreement with TravelPro would have been done.

*Davenport Deposition,* DN 214, Exh. C at 179-80. The evidence establishes that the agreements were precipitated by the former CEO (Dudash) aggressively recruiting the Management Employees away from Debtor.[13] Further, the sale of the company was initially intended to be conducted outside of bankruptcy.[14]

The U.S. Trustee argues that if the court finds that the structure of the Bonus Agreements prevents the bonuses from being considered administrative expenses of the estate, therefore

---

[13] *See* Deposition of Robert C. Davenport, DN 214, Exh. C at 129, 132-35.

[14] *See* 2/27/06 Sale Hearing Transcript, DN 180 at 34-65.

10

avoiding the limitations of §503(c), the directors and controlling shareholders of the Debtor may have created a conflict of interest by allowing the officers to be compensated by a secured lender.[15] In doing so, the U.S. Trustee contends, the directors, officers, and controlling shareholders may have breached their fiduciary duty to act in the best interests of the corporate Debtor and creditor body. "[T]he willingness . . . to leave debtors in possession 'is premised upon an assurance that the officers and managing employees of the debtor can be depended upon to carry out the fiduciary responsibilities of a trustee.'" *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 355 (1985)(citation omitted). *See also Wolf v. Weinstein*, 372 U.S. 633, 651, *rehearing denied* 373 U.S. 928 (1963).

A debtor-in-possession, as a fiduciary of the bankruptcy estate, is required to protect and conserve property for the benefit of creditors. "Directors of an insolvent corporation hold their powers 'in trust' for all creditors of the corporation. They may not use their powers for their own benefit and to the detriment of creditors." *In re Insulfoams, Inc.*, 184 B.R. 694, 703-04 (Bankr.W.D.Pa. 1995), *aff'd sub nom. Donaldson v. Bernstein*, 104 F.3d 547 (3d Cir. 1997). In essence, the argument asserts that if Mr. Davenport, who was signatory to the agreement as the Managing Director of Cerberus Capital and also a member of the Board of Directors of the Debtor, was acting on behalf of Cerberus, and the agreement to pay the bonuses to the officers was for the benefit of Cerberus and to the detriment of the remaining creditors of Debtor, then Mr. Davenport may have breached his fiduciary duty as a Director of the Debtor. Similarly, if Berry, Kurowska, Miller, and Carr signed the agreement for their benefit and to the detriment of Debtor and the creditor body, then they also may have breached their fiduciary duty. Thus, we

---

[15]DN 205 at 4-8.

11

examine this issue to determine if there is an equitable basis on which to grant the Turnover Motion.

The Bonus Agreements themselves explicitly provide that the Management Employees must continue to comply with their fiduciary duties to the Debtor, even if such duties would conflict with the interests of Cerberus:

> <u>Duties</u>.  Notwithstanding anything to the contrary set forth herein, you will carry out your duties to the [Debtor] in a manner consistent with your fiduciary duties to the [Debtor] regardless of whether those duties would conflict with any duties owed to, or the interests of, Cerberus.  If the transaction contemplated in this letter agreement would, in the reasonable opinion of the [Debtor] or Cerberus, create any actual or perceived conflict of interest, the parties will use their reasonable efforts to enter into mutually satisfactory arrangements to compensate you in a manner that is reasonably designed to eliminate any such conflicts.

DN 214, Exhibit A.  Additionally, once in bankruptcy, the Management Employees were advised of their fiduciary duties to all of the Debtor's creditors.[16]

Despite the potential for breaches of fiduciary duty, none have been established in this case.  All evidence indicates that both Cerberus and the Management Employees of the Debtor acted in good faith to maximize the value of the Debtor's business and estate.  After the CEO left Debtor's employ and started to recruit Debtor's employees, and after Debtor lost many customers and faced winding down its business, Cerberus and Debtor were concerned that the loss of the remaining executives, who were being heavily recruited by the former CEO, would be devastating to the business and detrimental to the sale.  Robert Davenport, representative of Cerberus, testified in deposition that after the former CEO left Debtor, he started trying to recruit Kurowska and Miller.  Davenport Deposition, DN 214, Exhibit C, at 129.  Maximizing the sale

---

[16] *See* DN 90 at 3.  Debtor's assertion in its motion to sell is not disputed.

proceeds serves the interests of the creditor body, not just those of Debtor and Cerberus as the secured creditor. No unsecured creditor will be paid until the secured creditor is paid. In this case, because Cerberus will not be paid its secured claim in full from this sale, there are no proceeds available to pay other creditors. Thus any bonuses to be paid would necessarily have to come from Cerberus's funds, not the estate's.

This court recognizes that similar arrangements must be closely scrutinized so that they are not used to circumvent §503(c) or to compromise the fiduciary duty of insiders. However, the specific and peculiar facts and circumstances of the present case, where the agreement was negotiated prepetition and before BAPCPA took effect and Debtor expected either to close the sale without filing bankruptcy or to file bankruptcy prior to BAPCPA taking effect, indicate that the Bonus Agreements were entered into in good faith and for the benefit of the Debtor and the creditor body.

An appropriate order denying the Turnover Motion and overruling the objections to the Transaction Bonuses will be entered.

_/s/ Judith K. Fitzgerald_ jmd
Judith K. Fitzgerald
United States Bankruptcy Judge

Dated: October 3, 2006


The case administrator sent copies of the Memorandum and Order to attached list.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: )<br>)<br>AIRWAY INDUSTRIES, INC., )<br>)<br>Debtor. )<br>_____ ) | Case No.: 06-20224 JKF<br><br>Chapter 11<br><br>Related to Document No. 147 |
| OFFICIAL COMMITTEE OF )<br>UNSECURED CREDITORS )<br>)<br>Movant, )<br>)<br>v. )<br>)<br>AIRWAY INDUSTRIES, INC., )<br>CERBERUS CAPITAL MANAGEMENT, )<br>L.P., MADELEINE, L.L.C. )<br>)<br>Respondents. )<br>_____ ) | |

## ORDER

For the reasons expressed in the foregoing Memorandum Opinion, it is Ordered this 3rd day of October, 2006, that the Motion of the Official Committee of Unsecured Creditors, DN 147, for turnover to the estate of the Transaction Bonuses is DENIED.  It is further Ordered that the Objection of the United States Trustee, DN 92, is overruled.

_____
Judith K. Fitzgerald
United States Bankruptcy Judge

jmd

The case administrator sent copies of the Memorandum and Order to attached list.

1

Joel M. Walker, Esq.
Duane Morris LLP
600 Grant Street, Suite 5010
Pittsburgh, PA 15219

Norma Hildenbrand, Esquire
Office of the U.S. Trustee
9th Floor, Liberty Center
1001 Liberty Avenue
Pittsburgh, PA 15222

Deborah C. Phillips, Esquire
Department of Labor &
Industry
914 Penn Avenue, 6th Floor
Pittsburgh, PA 15222

Joel Helmrich, Esquire
Meyer, Unkovic & Scott LLP
1300 Oliver Building
535 Smithfield Street
Pittsburgh, PA 15219

John Pietro
170 Topaz
Canton, OH 44406

Lawrence C. Gottlieb,
Esquire
Adam Rogoff, Esquire
Kronish Lieb Weiner &
Hellman LLP
1114 Avenue of the Americas
New York, NY 10036-7798

Robert C. Edmundson,
Esquire
PA Department of Revenue
564 Forbes Avenue, 6th Fl.
Pittsburgh, PA 15219

Teachers Insurance and
Annuity
Association of America
Attention: Sharon Manewitz
730 Third Avenue
New York, NY 10017

Phil Uher, Esquire
Brian Lawton, Esquire

Metz Lewis LLC
11 Stanwix Street, 18th Floor
Pittsburgh, PA 15222

Edward L. Laubach, Jr.,
Esquire
Senior Attorney
Internal Revenue Service
1001 Liberty Avenue
Pittsburgh, PA 15222

James F. Grenen, Esquire
Grenen & Birsic, P.C.
One Gateway Center, 9th
Floor
Pittsburgh, PA 15222

Schuyler G. Carroll, Esquire
Robert M. Hirsh, Esquire
George P. Angelich, Esquire
Arent Fox PLLC
1675 Broadway
New York, NY 10019

Lawrence Gelber, Esquire
Howard O. Godnick. Esquire
Schulte Roth & Zebel, LLP
919 Third Avenue
New York, NY 10022

Gilbert B. Weisman, Esquire
Becket and Lee LLP
POB 3001
Malvern, PA 19355

Raymond M. Patella, Esquire
Blank Rome LLP
One Logan Square
Philadelphia, PA 19103

Steven S. Santoro, Esquire
Gefsky and Lehman, P.C.
2301 One PPG Place
Pittsburgh, PA 15222


Howard N. Gorney, Esquire
c/o Nixon Peabody LLP

100 Summer Street
Boston, MA 02110

Renee F. Bergmann, Esquire
Nixon Peabody LLP
1818 Market Street, 11th
Floor
Philadelphia, PA 19103

Libra Securities
11766 Wilshire Blvd., Ste.
870
Los Angeles, CA 90025

U.S. Bancorp
Attention: Daniel Spiller
800 Nicollet Mall
Mail Code BC-MN-H18T
Minneapolis, MN 55402

Gary Cerrone
106 Pinto Court
Bethel Park, PA 15102

J. Richard Abraham
85 Quail Hill Lane
Pittsburgh, PA 15238

George M. Dempster,
Esquire
Fenningham Stevens &
Dempster,
Five Neshaminy Interplex,
Suite 315
Trevose, PA 19053

Malhar S. Pagay, Esquire
Pachulski Stang Ziehl Young
Jones &
Weinstraub LLP
10100 Santa Monica
Boulevard,
11th Fl.
Los Angeles, CA 90067



Tina L. Campo, Esquire
Saul Ewing LLP

2

Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102

500 Group Holdings, Inc.
Attention: Ed Bermas
700 Canal Street
Stamford, CT 06902

ADT Security Services, Inc.
POB 96175
Las Vegas, NV 89193

AT&T
POB 90013909
Louisville, KY 40290

BRT Enterprises
6990 Haigh Street
Orland, CA 95963

Bruce Weiner Family Ltd. Partnership
930 Beaver Avenue
Ellwood City, PA 16117

Data Micro, Inc.
267 Matheson Boulevard, East Unit 1
Mississauga Ontario
Canada L4Z 1X8

IBM Credit Corporation
POB 643600
Pittsburgh, PA 15264

Sterling Commerce, Inc.
POB 73199
Chicago, IL 60673

Valley Office Solutions
8534 South Avenue
Youngstown, OH 44514

Pitney Bowes Credit Corporation

Bankruptcy Department
27 Waterview Drive
Shelton, CT 06484